**FILED**
CLERK, U.S. DISTRICT COURT

12/20/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ VM ___ DEPUTY

1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   ERIK M. SILBER (Cal. Bar No. 190534)
4  Assistant United States Attorney
   Environmental and Community Safety Crimes Section
5       1300 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-2231
7       Facsimile: (213) 894-8513
        E-mail:   Erik.Silber@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,          No. CR  8:21-CR-00227-DOC

13            Plaintiff,               PLEA AGREEMENT FOR DEFENDANT
                                       SCOTT V. SPINA, JR.
14            v.

15  SCOTT V. SPINA, JR.,

16            Defendant.

17

18       1.   This constitutes the plea agreement between SCOTT V. SPINA,

19  JR. ("defendant") and the United States Attorney's Office for the

20  Central District of California (the "USAO") in the above-captioned

21  case.  This agreement is limited to the USAO and cannot bind any

22  other federal, state, local, or foreign prosecuting, enforcement,

23  administrative, or regulatory authorities.

24                    DEFENDANT'S OBLIGATIONS

25       2.   Defendant agrees to:

26            a.   Give up the right to indictment by a grand jury and,

27  at the earliest opportunity requested by the USAO and provided by the

28  Court, appear and plead guilty to an five-count information in the

form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant in count one with mail fraud in violation of 18 U.S.C. § 1341, counts two, three, and four with wire fraud in violation of 18 U.S.C. § 1343, in count five with aggravated identity theft, in violation of 18 U.S.C. § 1028A.

        b.   Not contest facts agreed to in this agreement.

        c.   Abide by all agreements regarding sentencing contained in this agreement.

        d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

        e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

        f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

        g.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

THE USAO'S OBLIGATIONS

3.   The USAO agrees to:

        a.   Not contest facts agreed to in this agreement.

        b.   Abide by all agreements regarding sentencing contained in this agreement.

        c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction

in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d.   With respect to counts one, two, three, and four, recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.  For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A , without regard to reductions in the term of imprisonment that may be permissible through the substitution of community confinement or home detention as a result of the offense level falling within Zone B or Zone C of the Sentencing Table.

e.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of wire fraud, 18 U.S.C. § 1343, mail fraud, 18 U.S.C. § 1341, and/or aggravated identity theft, 18 U.S.C. § 1028A, arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 15 below.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

## NATURE OF THE OFFENSES

4.    Defendant understands that for defendant to be guilty of the crime charged in count one of the information, that is, mail fraud, in violation of 18 U.S.C. § 1341, the following must be true: (1) the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

5.    Defendant understands that for defendant to be guilty of the crime charged in counts two, three, and four of the information, that is, wire fraud, in violation of 18 U.S.C. § 1343, the following must be true: (1) the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and (4) the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

6.   Defendant understands that for defendant to be guilty of the crime charged in count five of the information, that is, aggravated identity theft, in violation of 18 U.S.C. § 1028A, the following must be true: (1) the defendant knowingly transferred, possessed, or used without legal authority a means of identification of another person or a false identification document; (2) the defendant knew that the means of identification belonged to a real person; and (3) the defendant did so during and in relation to mail fraud, in violation of 18 U.S.C. § 1341, as charged in count one of the information.

<u>PENALTIES</u>

7.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1341, as charged in count one of the information, is: 30 years imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

8.   Defendant understands that the statutory maximum sentence that the Court can impose for each violation of 18 U.S.C. § 1343, as charged in counts two, three, and four of the information, is: 20 years imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

9.   Defendant understands that the statutory mandatory minimum sentence that the Court must impose for a violation of 18 U.S.C. § 1028A, as charged in count five of the information, is: a two-year term of imprisonment, which must run consecutive to any other

sentence of imprisonment; and a mandatory special assessment of $100. Defendant understands that the maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1028A is: a two-year term of imprisonment, a one-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest, and a mandatory special assessment of $100.

10.  Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 92 years imprisonment; a three-year period of supervised release; a fine of $1,250,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $500.

11.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

12.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or

ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

13.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

RESTITUTION

14.  Defendant agrees to make full restitution to the victims of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than

7

1    the victims of the offenses to which defendant is pleading guilty and

2    in amounts greater than those alleged in the counts to which

3    defendant is pleading guilty.   In particular, defendant agrees that

4    the Court may order restitution to any victim of any of the following

5    for any losses suffered by that victim as a result any relevant

6    conduct, as defined in U.S.S.G. § 1B1.3, in connection with the

7    offenses to which defendant is pleading guilty, including to former

8    New England Patriots player T.J.

9                            FACTUAL BASIS

10        15.  Defendant admits that defendant is, in fact, guilty of the

11   offenses to which defendant is agreeing to plead guilty.   Defendant

12   and the USAO agree to the statement of facts provided below and agree

13   that this statement of facts is sufficient to support pleas of guilty

14   to the charges described in this agreement and to establish the

15   Sentencing Guidelines factors set forth in paragraph 17 below but is

16   not meant to be a complete recitation of all facts relevant to the

17   underlying criminal conduct or all facts known to either party that

18   relate to that conduct.

19        In Super Bowl LI, played on February 5, 2017, the New England

20   Patriots overcame a 28-3 deficit to win the 2016 championship in

21   overtime, with Tom Brady named the Super Bowl MVP.   After the Super

22   Bowl, there was tremendous excitement and interest from Patriots fans

23   and collectors for memorabilia associated with the championship.   For

24   example, in May 2020, the Patriots team owner auctioned his Super

25   Bowl LI ring for charity, which sold for $1.025 million.

26        The championship rings for Super Bowl LI (referred to as the

27   "Super Bowl ring" "Super Bowl LI ring" or "2016 Super Bowl ring")

28   featured five Lombardi trophies made up of diamonds, representing the

1    number of championships that the Patriots had won at that time.   On
2    the inside of the ring (called the "arbor"), was engraved "GREATEST
3    COMEBACK EVER," which was "a nod to the 31-unanswered points scored
4    to record the most dramatic come-from-behind win in Super Bowl
5    history."   One particular ring company ("the Ring Company") was the
6    only company authorized to manufacture these rings.

7          On June 9, 2017, the Patriots had a private party at the team
8    owner's home where the players received their Super Bowl LI rings.
9    Former patriots player, T.J., who was not then playing for the
10   Patriots but was a member of the championship team, did not attend
11   the party.   Instead, he received his ring with an accompanying letter
12   from the Patriots team owner on or about July 24, 2017.

13         Starting in and around September 22, 2017, defendant and T.J.
14   communicated via Instagram about defendant buying T.J.'s Super Bowl
15   ring and college football rings, with defendant stating that the
16   rings would get auctioned and defendant would either pay T.J. $32,000
17   outright for the rings or T.J. could accept a percentage of the
18   auction amount.   Defendant identified that "the college rings are
19   worth only a few grand all together . . . it's the patriot ring that
20   is worth the amount they are paying."

21         On September 25, 2017, defendant flew with his girlfriend, D.S.,
22   from New Jersey, where he lived, to Georgia, to meet with T.J. to
23   purchase the Super Bowl LI ring and seven college football rings.
24   They met that day at a gas station in Jesup, Georgia, with
25   defendant's girlfriend, D.S., taking a photograph of defendant and
26   T.J. meeting and going over paperwork (which defendant later provided
27   to a buyer, S.W., to support authenticity).   Defendant gave T.J. at
28   least one check to pay for the rings, and defendant knew there were

9

insufficient funds to cover payment at the time he provided payment.
In exchange, T.J. gave defendant his rings, including the Super Bowl
LI ring, and then later tried to unsuccessfully cash the check(s).

In September 2017, defendant called S.W. to sell him T.J.'s
Super Bowl LI ring and seven college football rings. The two did not
know each other previously, but S.W. was a well-known buyer and
seller of championship rings, used an e-mail address "rings of
champions," and resided in Orange County, California. S.W. flew to
New Jersey to complete the sale. On September 29, 2017, defendant
signed a written agreement transferring ownership of T.J.'s LI Super
Bowl ring to S.W. for $63,000 (although defendant's written agreement
with S.W. stated that defendant owned the rings "free and clear," he
did not, as he had given T.J. at least one check not supported by
sufficient funds). Defendant insisted on being paid the $63,000 by
S.W. in cash and S.W. got the cash by going to multiple Bank of
America locations in New Jersey to withdraw the cash, which he
provided to defendant.

When defendant got T.J.'s Super Bowl LI ring, he also obtained
the original paperwork from the Ring Company from T.J., which
included a document with a web address and T.J.'s login and password
for ordering Patriots family collection materials from Super Bowl LI
(defendant did not provide that information to S.W. when he sold him
T.J.'s Super Bowl LI ring). That collection included Super Bowl
rings that Patriots players could order for their family and friends
that were a little smaller than the player Super Bowl rings, but
otherwise appeared very similar to the players rings. T.J., as a
player on the championship team could order those rings from the Ring

1   Company; they were not available to purchase from members of the

2   public, such as defendant.

3        On September 28, 2017, defendant called the Ring Company and

4   said "I want to purchase a family ring for the Patriots." Defendant

5   said he was having problems ordering the ring online. He said the

6   materials from the Ring Company said that he could customize the ring

7   and he asked "can that be my family last name or could it be my first

8   name?" The employee, Kim, said he could and it could be anything

9   within the character limit. Defendant asked how long it would take

10  to get it and Kim said six to eight weeks. Defendant asked if he

11  could give an address where the ring would be shipped (or whether it

12  would go to the "facility," i.e., the Patriots). Kim told defendant

13  it could be shipped to an address he provided. Defendant initially

14  claimed he was ordering this ring for his wife (and then later also

15  asked about ordering another ring for himself). They discussed the

16  difference between Super Bowl rings given to the players and the

17  family and friends rings he could order. As part of that discussion,

18  Kim asked defendant for his name so she could look up what he had

19  already ordered and he said "T.J." Defendant identified that the

20  website said these rings would be 10% smaller than the player rings

21  and he said "I have the player ring," "what's the difference." Kim

22  said it's going to be smaller but they "are very similar" and the

23  "overall design concept is pretty much identical," but it has smaller

24  stones. Defendant engaged in these steps to test to see whether he

25  could fraudulently order a ring by claiming to be T.J., whether he

26  could have a name of his choice engraved into the ring, whether he

27  could have it mailed to him at his address, and whether the ring

28  would look similar to the player rings.

The next day, on September 29, 2017, defendant called back, again got Kim, and stated "this is T.J." He said "I'm gonna place a couple of ring orders today. . . I want to get uh a quarterback a present for his baby . . .[f]or the son." Defendant asked "[i]f I want to personalize it in his last name what do I do?" Defendant asked if he could place that order on his account and expressed concern that the order would get cancelled when the last name on the ring did not match his name on the account. Kim said that that would not be a problem, but later said that she would "make a note of it T. and then if they question it at all I will make sure the order is released." Kim asked "what's the um quarterback last name that you're looking to order it for?" and defendant responded "Brady," which he spelled out "B" "r" "a" "d" "y." Kim confirmed that "so you're purchasing it as a gift for his baby," which defendant said "[y]es." Defendant asked about payment, and Kim said payment had to be made upfront at time of the order. Defendant asked if the rings could be ready by Thanksgiving, which Kim said that she knew the two of them had discussed on the previous call, but she would have to check. Kim then advised the ring may be ready by the second week of November.

On October 4, 2017, defendant called the Ring Company, said "this is [T.J.]" with the "Patriots" and said he was calling about "a ring that I want to purchase for somebody. A Patriots Super Bowl ring for Brady." Defendant said that he had spoken to someone about it the previous week a couple of times. The person from the Ring Company asked him his name again and he said "T.J" and spelled out the first name. The person from the Ring Company looked it up and told defendant that the person he had spoken to was Kim. The

1  employee transferred defendant to Kim.  Defendant told Kim that his

2  financial advisor said he could not get approved to pay for the rings

3  on his credit card and asked about wiring the money instead.  Kim

4  asked about much money were they talking, and defendant said three

5  rings and about $30,0000.  Kim said she had never heard of doing a

6  wire transfer, but would check.  After checking, Kim said they could

7  not take a wire transfer.  Defendant said his financial advisor,

8  identified as D.S., would contact the company (in fact, there was no

9  financial advisor involved and defendant intended to send e-mails to

10  the Ring Company purporting to be D.S.).  During the call, defendant

11  confirmed that Brady's name would appear where the last name would

12  normally appear on the ring.  Kim asked "Correct if that's what you

13  want.  Yep and these are for . . . rings for his Children or child?"

14  Defendant said "Yeah his – his family."

15      Defendant called back later that day, asked to speak to Kim, and

16  identified himself by the first name for "T.J."  After he was

17  transferred to Kim, defendant said that his financial advisor had run

18  into a problem, and he asked whether they could send a certified bank

19  check instead.  Kim said they could.  Defendant thanked her and said

20  "that saves everything."  Kim said she would take the order over the

21  phone to get it started (before the certified check arrived).

22  Defendant and Kim went over the price for the three rings.  Defendant

23  said he wanted three family/friend rings, confirmed the sizes (eight,

24  eleven, and twelve), and defendant said that the rings should say

25  "Brady" on them (which he again spelled out "B" "r" "a" "d" "y").

26  Kim asked for an address to mail the rings to (to be placed on the

27  order), and defendant said to mail them to his purported financial

28  advisor, D.S. who lived "somewhere" in New Jersey, and then he gave

Kim his address in New Jersey.  Kim said the cost for the rings was $31,757.86.  Defendant asked if there was an order number associated with it to put on the check and Kim said not yet, but to add "T.J. order" to the memo line.  Kim provided her last name for defendant to mail the certified check to and the address of the Ring Company in Minnesota.  Kim said she would get the order ready to go and, when they had payment, they would submit the order.

On October 5, 2017, defendant called the Ring Company again, again identified himself as "T.J." and asked to speak to Kim, who he said he had spoken to the previous day.  Defendant was told Kim was not available.  Defendant told the Ring Company employee that his financial advisor was mailing the check for the rings that day. Defendant asked the Ring Company employee to provide the e-mail address where the defendant could e-mail a copy of the check. Defendant said the check would be mailed for overnight delivery.  On that same date, October 5, 2017, defendant sent via United Postal Service ("UPS") package from New Jersey to the Ring Company in Minnesota, a cashier's check for $31,757.86.  The package was mailed by defendant in the purported name of his financial advisor, D.S., and the cashier check was made out to the Ring Company and had defendant's name pre-printed on it by the issuing bank on the remitter line.  Defendant caused "T.J." "[ring company] order" to be handwritten onto the cashier check onto the remitter line. Defendant, identifying himself as his purported financial advisor, D.S., sent an e-mail to Kim at the Ring Company with the tracking information for the cashier's check for the T.J. "gift order" and a photograph of the certified bank check.

14

1    On October 9, 2017, defendant called the Ring Company, got Kim,

2  identified himself by the first name for "T.J." and asked if the Ring

3  Company had received the check.  Kim said that they had and had sent

4  it for processing.  Kim said they were going to expedite the rings

5  and they were scheduled to be completed the week of Thanksgiving, but

6  she was going to try to get them sooner.  Defendant asked Kim to

7  follow up with D.S. by email, which defendant knew would come to him.

8  Kim asked if D.S. would be the main point of contact and defendant

9  asked that Kim work with D.S. (who would actually be defendant

10 sending e-mail communications in D.S.'s name).

11    On October 9, 2017, defendant again called the Ring Company,

12 represented himself by the first name of T.J., asked to speak to Kim

13 and, when she was not available, changed one of the ring sizes.  Kim

14 also sent an e-mail on the same date to defendant's purported

15 financial advisor, D.S., identifying that the check had been received

16 and confirming the ring size change (from 8 to 9).  On October 30,

17 2017, defendant called the Ring Company back, spoke to Kim, and she

18 told him that the delivery date had tentatively been moved up to

19 November 8, although the goal was to have them by Thanksgiving.  On

20 October 31, 2017, however, Kim e-mailed defendant's purported

21 financial advisor, D.S., and said there was a problem with the rings,

22 they needed to be re-done, and they were not likely to be shipped

23 until November 16, 2017.

24    On November 14, 2017, Kim e-mailed defendant's purported

25 financial advisor, D.S., that the rings were "still on track to be

26 shipped this week.  I heard from [T.J.] earlier and know how

27 important the rings are for this weekend," as it had previously been

28 represented that Tom Brady would present these as Christmas presents

during Thanksgiving.  On November 17, 2017, the Ring Company sent the three rings to defendant at his address in New Jersey via UPS. Defendant received the rings on Nov. 18 (and confirmed receipt to the Ring Company via e-mail on November 19 using the account in the name of his purported financial advisor, D.S.).

Before he had received the rings, but on the same day that he started the order with the Ring Company, on September 29, 2017, defendant texted S.W. and told him that he was working "a deal out with brady rings" (defendant sent this text on the same day shortly after they had concluded the sale for T.J.'s Super Bowl LI ring). Defendant later told S.W. that he knew three nephews of Tom Brady, defendant said that Tom Brady had purchased the Friends/Family rings for each of his nephews as gifts, and Tom Brady was going to give the rings as a gift to his nephews at Thanksgiving.  Defendant claimed that the nephews lived in Massachusetts and were going to sell the rings to defendant.  Defendant advised that the rings were 90% the size of player rings.  Defendant made clear that, at that time, he did not have possession of the rings.

On October 5, 2017, defendant and S.W. entered into a written contract to purchase "Three (3) Tom Brady Family 2016 New England Patriots Super Bowl LI World Championship Rings."[1]  In the written contract, defendant represented that the three rings "were ordered for Tom Brady directly from [The Ring Company], for select family members," when defendant knew that that representation was fraudulent.  Instead, defendant had ordered those rings by

---

[1] S.W. was going to buy the rings with another person, B.H., and S.W. and B.H. were going to split the cost of the rings, but defendant's communications and contract were to, and with, S.W.

16

1  fraudulently claiming to be former Patriots player T.J., and

2  defendant knew the rings were not ordered by, or authorized by, Tom

3  Brady.   In the written contract, S.W. agreed to pay $81,500 for the

4  three rings, with $6,500 "[d]eposit to be wired" in advance and

5  $75,000 to pay due "at time of pick-up" of the rings.   Defendant sent

6  on October 5, 2017, overnight, via FedEx, the signed copy of the

7  contract from New Jersey, to S.W. in Orange County California, which

8  S.W. received in Orange County the next day.   Defendant and S.W.

9  agreed to the contract for the sale of the rings on October 5, 2017,

10  the same date that defendant sent the $31,757.86 to the Ring Company,

11  which defendant sent to the Ring Company to ensure that he received

12  the rings that he agreed that day to sell for $81,500.

13      S.W. made three wire transfers using a Zelle banking app, to pay

14  the $6,500 deposit.   S.W. made the transfers from his Bank of America

15  account using his electronic devices from Orange County, California

16  to defendant's PNC Bank account associated with an address in New

17  Jersey, which defendant received in New Jersey.   Specifically, on

18  October 6, 2017, S.W. wired $2,500 with the description "1st Payment

19  on our agreed upon $6,500 DEPOSIT of our October 5, 2017 CONTRACT for

20  #3# Tom Brady Family 2016 New England Patriots Super Bowl Rings!

21  Balance of $4,000 remaining."   On October 7, 2017, S.W. wired $2,500

22  with the description "2nd Payment on our agreed upon $6,500 DEPOSIT

23  of our October 5, 2017 CONTRACT for three 3 Tom Brady Family 2016 New

24  England Patriots Super Bowl Rings! Balance of $1,500 remaining."   On

25  October 9, 2017, S.W. wired $1,500 with the description "3rd Payment

26  on our agreed upon $6,500 DEPOSIT on our October 5, 2017 CONTRACT for

27  3-Tom Brady Family 2016 New England Patriots Super Bowl Rings!

28  Balance of deposit is paid in-full."

1      S.W. was scheduled to fly to New Jersey on November 14, 2017, to
2  pick up the rings from defendant, but postponed the trip because the
3  rings were not ready.  He also began having concerns about the
4  legitimacy of the transaction because his research suggested that Tom
5  Brady did not have any nephews.  On November 18, 2017, the same day
6  that defendant received the rings from the Ring Company, he sent S.W.
7  various photographs of the three rings that he was purportedly
8  picking up in Massachusetts, including:





Im here now I have all 3

The geolocation for the photographs, however, showed New Jersey, not Massachusetts (and the weight of the rings was off from what was in the contract). On November 18, 2017, S.W. asked to cancel the deal. Defendant neither delivered the rings, nor returned the deposit. Instead, defendant sold the rings that day to an auction house, G.A. On November 18, 2017, G.A. entered into a written contract with defendant, agreeing to pay defendant $100,000 for the three rings. Defendant signed a representation in writing that he

1  "purchased these 3 2017 Tom Brady Super Bowl Rings from a family

2  member of Tom Brady.  This family member was authorized by Tom Brady

3  to order the rings," which defendant knew was not true.  Defendant

4  provided the three rings to G.A. on or about November 18, 2017, which

5  was the same date he received them from the Ring Company.  Defendant

6  personally delivered the rings that evening to the owner of G.A. who,

7  like defendant, was located in New Jersey.  One of the rings was

8  later sold in February 2018 at auction by G.A. to a buyer for

9  $337,219.53.  Shortly before the auction in 2018, S.W. received

10  $6,500 from defendant to settle his claim to the rings after he

11  objected to the sale (at the insistence of the owner of G.A., who did

12  not want the auction disrupted).

13                          SENTENCING FACTORS

14      16.  Defendant understands that in determining defendant's

15  sentence the Court is required to calculate the applicable Sentencing

16  Guidelines range and to consider that range, possible departures

17  under the Sentencing Guidelines, and the other sentencing factors set

18  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

19  Sentencing Guidelines are advisory only, that defendant cannot have

20  any expectation of receiving a sentence within the calculated

21  Sentencing Guidelines range, and that after considering the

22  Sentencing Guidelines and the other § 3553(a) factors, the Court will

23  be free to exercise its discretion to impose any sentence it finds

24  appropriate up to the maximum set by statute for the crimes of

25  conviction.

26

27

28

17.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:                7        [U.S.S.G. § 2B1.1(a)(1)]

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate, including for the government to argue for loss enhancement under U.S.S.G. § 2B1.1(b)(1).

18.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

19.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

20.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.    The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

1        e.    The right to confront and cross-examine witnesses

2   against defendant.

3        f.    The right to testify and to present evidence in

4   opposition to the charges, including the right to compel the

5   attendance of witnesses to testify.

6        g.    The right not to be compelled to testify, and, if

7   defendant chose not to testify or present evidence, to have that

8   choice not be used against defendant.

9        h.    Any and all rights to pursue any affirmative defenses,

10  Fourth Amendment or Fifth Amendment claims, and other pretrial

11  motions that have been filed or could be filed.

12                  WAIVER OF APPEAL OF CONVICTION

13       21.  Defendant understands that, with the exception of an appeal

14  based on a claim that defendant's guilty pleas were involuntary, by

15  pleading guilty defendant is waiving and giving up any right to

16  appeal defendant's convictions on the offenses to which defendant is

17  pleading guilty.  Defendant understands that this waiver includes,

18  but is not limited to, arguments that the statutes to which defendant

19  is pleading guilty are unconstitutional, and any and all claims that

20  the statement of facts provided herein is insufficient to support

21  defendant's pleas of guilty.

22             LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

23       22.  Defendant agrees that, provided the Court imposes a total

24  term of imprisonment on all counts of conviction of no more than 65

25  months, defendant gives up the right to appeal all of the following:

26  (a) the procedures and calculations used to determine and impose any

27  portion of the sentence; (b) the term of imprisonment imposed by the

28  Court; (c) the fine imposed by the Court, provided it is within the

statutory maximum; (d) to the extent permitted by law, the
constitutionality or legality of defendant's sentence, provided it is
within the statutory maximum; (e) the amount and terms of any
restitution order, provided it requires payment of no more than
$50,000; (f) the term of probation or supervised release imposed by
the Court, provided it is within the statutory maximum; and (g) any
of the following conditions of probation or supervised release
imposed by the Court: the conditions set forth in Second Amended
General Order 20-04 of this Court; the drug testing conditions
mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and
drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

23.   The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum specified above and
(b) the Court imposes a term of imprisonment of no less than 57
months, the USAO gives up its right to appeal any portion of the
sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

24.   Defendant agrees that if, after entering guilty pleas
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty pleas on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge that was either dismissed or not filed as a result
of this agreement, then (i) any applicable statute of limitations
will be tolled between the date of defendant's signing of this
agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute

24

of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

25.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

26.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the USAO will be relieved of all its obligations under this agreement.

27.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

28.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

29.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information

to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 17 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

30.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

31.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3          PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4      32.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10 TRACY L. WILKISON
   United States Attorney

11

12 _____        12/17/21
                                          _____
13 ERIK M. SILBER                         Date
   Assistant United States Attorney

14 _____        _____
15 SCOTT V. SPINA, JR.                     Date
   Defendant

16 _____        _____
17 THOMAS AMBROSIO                         Date
   Attorney for Defendant Spina

18

19

20              CERTIFICATION OF DEFENDANT

21     I have read this agreement in its entirety.  I have had enough

22 time to review and consider this agreement, and I have carefully and

23 thoroughly discussed every part of it with my attorney.  I understand

24 the terms of this agreement, and I voluntarily agree to those terms.

25 I have discussed the evidence with my attorney, and my attorney has

26 advised me of my rights, of possible pretrial motions that might be

27 filed, of possible defenses that might be asserted either prior to or

28 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

1  promise, understanding, or agreement may be entered into unless in a
2  writing signed by all parties or on the record in court.

3  <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

4      32.  The parties agree that this agreement will be considered
5  part of the record of defendant's guilty plea hearing as if the
6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
9  CALIFORNIA

10 TRACY L. WILKISON
   United States Attorney

11

12 _____        _____
   ERIK M. SILBER                         Date
13 Assistant United States Attorney

14 _____        12/13/21
                                          _____
15 SCOTT V. SPINA, JR.                    Date
   Defendant

16 _____        12-13-21
                                          _____
17 THOMAS AMBROSIO                        Date
   Attorney for Defendant Spina

18

19

20              <u>CERTIFICATION OF DEFENDANT</u>

21      I have read this agreement in its entirety.  I have had enough
22 time to review and consider this agreement, and I have carefully and
23 thoroughly discussed every part of it with my attorney.  I understand
24 the terms of this agreement, and I voluntarily agree to those terms.
25 I have discussed the evidence with my attorney, and my attorney has
26 advised me of my rights, of possible pretrial motions that might be
27 filed, of possible defenses that might be asserted either prior to or
28 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

                                28

1  of relevant Sentencing Guidelines provisions, and of the consequences

2  of entering into this agreement.  No promises, inducements, or

3  representations of any kind have been made to me other than those

4  contained in this agreement.  No one has threatened or forced me in

5  any way to enter into this agreement.  I am satisfied with the

6  representation of my attorney in this matter, and I am pleading

7  guilty because I am guilty of the charges and wish to take advantage

8  of the promises set forth in this agreement, and not for any other

9  reason.

10

11  SCOTT V. SPINA, JR.                    Date    12/13/21
   Defendant

12

13

14

15              CERTIFICATION OF DEFENDANT'S ATTORNEY

16      I am Scott V. Spina, Jr.'s attorney.  I have carefully and

17  thoroughly discussed every part of this agreement with my client.

18  Further, I have fully advised my client of his rights, of possible

19  pretrial motions that might be filed, of possible defenses that might

20  be asserted either prior to or at trial, of the sentencing factors

21  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

22  provisions, and of the consequences of entering into this agreement.

23  To my knowledge: no promises, inducements, or representations of any

24  kind have been made to my client other than those contained in this

25  agreement; no one has threatened or forced my client in any way to

26  enter into this agreement; my client's decision to enter into this

27  agreement is an informed and voluntary one; and the factual basis set

28

                              29

forth in this agreement is sufficient to support my client's entry of

guilty pleas pursuant to this agreement.

_____          12-13-21
THOMAS AMBROSIO                         Date
Attorney for Defendant Spina

30

Exhibit A – Draft Information

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>SCOTT V. SPINA, JR.,<br><br>            Defendant. | CR No.<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1341]

A.    THE SCHEME TO DEFRAUD

1.    Beginning on or around September 29, 2017, and continuing until at least on or about November 18, 2017, in Orange County, California within the Central District of California, and elsewhere, defendant SCOTT V. SPINA, JR., knowingly and with the intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts.

B.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

2.   The scheme to defraud operated, in substance, in the following manner:

a.   Defendant SPINA obtained former New England Patriots player T.J.'s championship ring from the Super Bowl played for the 2016 National Football League season ("Super Bowl LI ring") by providing T.J. at least one check that defendant SPINA knew was not backed by sufficient funds in defendant SPINA's bank account. Defendant SPINA then sold the ring to a well-known buyer of sports rings, S.W., located in Orange County, California, for $63,000.

b.   Along with the Super Bowl ring, T.J. provided defendant SPINA the written materials from the ring company that made that Super Bowl ring ("the Ring Company"), including a document with a web address and T.J.'s login and password for ordering Patriots family collection materials.  Defendant SPINA kept that material and did not provide it to S.W. when he sold T.J.'s Super Bowl ring.  That collection included family and friends Super Bowl rings that Patriots players could order, which were a little smaller than the Super Bowl rings issued to players, but otherwise appeared very similar to the Super Bowl LI ring.  T.J., as a player on the championship team, could order Super Bowl rings from the Ring Company, but they were not available to purchase by members of the public, such as defendant SPINA.

c.   Defendant SPINA then called the Ring Company, fraudulently identified himself as T.J., and started ordering three family and friend Super Bowl LI rings with the name "Brady" engraved on each one, which he falsely represented were gifts for the baby of quarterback Tom Brady.  Defendant SPINA, not T.J., was ordering the

2

1   rings and he did so by fraudulently claiming to be T.J.  The rings

2   were at no time authorized by Tom Brady.  Defendant SPINA intended to

3   obtain the three rings by fraud and to sell them at a substantial

4   profit.

5          d.   On the same date that he started to order the rings

6   with Tom Brady's name on them, which was shortly after S.W. had

7   bought the T.J. Super Bowl ring from defendant SPINA, defendant SPINA

8   texted S.W. and told him that he was working "a deal out with brady

9   rings."  Defendant SPINA then later falsely told S.W. that he knew

10   three nephews of Tom Brady, Tom Brady had purchased Friends/Family

11   Super Bowl rings for each of his nephews as gifts, and Tom Brady was

12   going to give the rings as a gift to his nephews at Thanksgiving.

13   Defendant SPINA falsely claimed that the nephews lived in

14   Massachusetts and were going to sell the rings to defendant SPINA.

15          e.   On or about October 5, 2017, defendant SPINA and S.W.

16   entered into a written contract to purchase "Three (3) Tom Brady

17   Family 2016 New England Patriots Super Bowl LI World Championship

18   Rings."  In the written contract, defendant SPINA represented that

19   the three rings "were ordered for Tom Brady directly from [the Ring

20   Company] for select family members," when defendant SPINA knew that

21   that representation was fraudulent.  Instead, defendant SPINA had

22   ordered those rings by fraudulently claiming to be former Patriots

23   player T.J., and defendant SPINA knew the rings were not ordered by,

24   or authorized by, Tom Brady.  In the written contract, S.W. agreed to

25   pay defendant SPINA $81,500 for the three rings, with $6,500

26   "[d]eposit to be wired" in advance and $75,000 to pay due "at time of

27   pick-up" of the rings, which were not then available.

28

1          f.   On or about October 5, 2017, defendant SPINA sent

2    overnight, via FedEx, the signed copy of the contract from New Jersey

3    to S.W. in Orange County, California, which S.W. received in Orange

4    County the next day.

5          g.   On the same date that defendant SPINA and S.W. agreed

6    to the contract for the sale of the three Super Bowl rings, defendant

7    SPINA sent a $31,757.86 certified bank check to the Ring Company to

8    pay for the three Super Bowl rings.

9          h.   S.W. made three wire transfers on or about October 6,

10   7, and 9, 2017, to defendant SPINA to pay the $6,500 deposit agreed

11   to in the contract.   S.W. made the payments from Orange County,

12   California, to defendant SPINA in New Jersey.

13   A.   USE OF THE MAIL

14        3.   On or about October 6, 2017, defendant SPINA, for the

15   purpose of executing the above-described scheme to defraud, caused to

16   be delivered by a private or commercial interstate carrier, an

17   envelope sent by defendant SPINA using FedEx from New Jersey to S.W.

18   in Orange County, California, in the Central District of California,

19   containing a signed written contract to purchase "Three (3) Tom Brady

20   Family 2016 New England Patriots Super Bowl LI World Championship

21   Rings," which defendant SPINA represented that "were ordered for Tom

22   Brady directly from [The Ring Company] for select family members,"

23   when defendant SPINA knew that that representation was fraudulent.

24

25

26

27

28

4

COUNTS TWO THROUGH FOUR

[18 U.S.C. § 1343]

A.   THE SCHEME TO DEFRAUD

1.   Beginning in or around October 2017 and continuing until at least on or about November 18, 2017, in Orange County, California, within the Central District of California, and elsewhere, defendant SCOTT V. SPINA, JR., knowingly and with the intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, promises, and the concealment of material facts.

B.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD

2.   The scheme to defraud operated, in substance, in the following manner:

a.   Defendant SPINA obtained former New England Patriots player T.J.'s championship ring from the Super Bowl played for the 2016 National Football League season ("Super Bowl LI ring") by providing T.J. at least one check that defendant SPINA knew was not backed by sufficient funds in defendant SPINA's bank account. Defendant SPINA then sold the ring to a well-known buyer of sports rings, S.W., located in Orange County, California, for $63,000.

b.   Along with the Super Bowl ring, T.J. provided defendant SPINA the written materials from the ring company that made that Super Bowl ring ("the Ring Company"), including a document with a web address and T.J.'s login and password for ordering Patriots family collection materials. Defendant SPINA kept that material and did not provide it to S.W. when he sold T.J.'s Super Bowl ring. That collection included family and friends Super Bowl rings that Patriots

1  players could order, which were a little smaller than the Super Bowl

2  rings issued to players, but otherwise appeared very similar to the

3  Super Bowl LI ring.   T.J., as a player on the championship team,

4  could order Super Bowl rings from the Ring Company, but they were not

5  available to purchase by members of the public, such as defendant

6  SPINA.

7        c.   Defendant SPINA then called the Ring Company,

8  fraudulently identified himself as T.J., and started ordering three

9  family and friend Super Bowl LI rings with the name "Brady" engraved

10 on each one, which he falsely represented were gifts for the baby of

11 quarterback Tom Brady.  Defendant SPINA, not T.J., was ordering the

12 rings and he did so by fraudulently claiming to be T.J.  The rings

13 were at no time authorized by Tom Brady.  Defendant SPINA intended to

14 obtain the three rings by fraud and to sell them at a substantial

15 profit.

16        d.   On the same date that he started to order the rings

17 with Tom Brady's name on them, which was shortly after S.W. had

18 bought the T.J. Super Bowl ring from defendant SPINA, defendant SPINA

19 texted S.W. and told him that he was working "a deal out with brady

20 rings."  Defendant SPINA then later falsely told S.W. that he knew

21 three nephews of Tom Brady, Tom Brady had purchased Friends/Family

22 Super Bowl rings for each of his nephews as gifts, and Tom Brady was

23 going to give the rings as a gift to his nephews at Thanksgiving.

24 Defendant SPINA falsely claimed that the nephews lived in

25 Massachusetts and were going to sell the rings to defendant SPINA.

26        e.   On or about October 5, 2017, defendant SPINA and S.W.

27 entered into a written contract to purchase "Three (3) Tom Brady

28 Family 2016 New England Patriots Super Bowl LI World Championship

Rings."  In the written contract, defendant SPINA represented that the three rings "were ordered for Tom Brady directly from [the Ring Company] for select family members," when defendant SPINA knew that that representation was fraudulent.  Instead, defendant SPINA had ordered those rings by fraudulently claiming to be former Patriots player T.J., and defendant SPINA knew the rings were not ordered by, or authorized by, Tom Brady.  In the written contract, S.W. agreed to pay defendant SPINA $81,500 for the three rings, with $6,500 "[d]eposit to be wired" in advance and $75,000 to pay due "at time of pick-up" of the rings, which were not then available.

   f. On or about October 5, 2017, defendant SPINA sent overnight, via FedEx, the signed copy of the contract from New Jersey to S.W. in Orange County, California, which S.W. received in Orange County the next day.

   g. On the same date that defendant SPINA and S.W. agreed to the contract for the sale of the three Super Bowl rings, defendant SPINA sent a $31,757.86 certified bank check to the Ring Company to pay for the three Super Bowl rings.

   h. S.W. made three wire transfers on or about October 6, 7, and 9, 2017, to defendant SPINA to pay the $6,500 deposit agreed to in the contract.  S.W. made the payments from Orange County, California, to defendant SPINA in New Jersey.

C. USE OF THE WIRES

  3. On or about the dates listed below, defendant SPINA, for the purpose of executing the above-described scheme to defraud, caused the transmission by means of wire communication in interstate and foreign commerce, the following transfers of money, from S.W., using a Zelle banking app from Orange County, California, in the

Central District of California, from S.W.'s Bank of America account, to defendant SPINA's PNC account in New Jersey:

| Count | Date | Act |
|---|---|---|
| TWO | October 6, 2017 | S.W. wired defendant SPINA $2,500 with the description "1st Payment on our agreed upon $6,500 DEPOSIT of our October 5, 2017 CONTRACT for #3# Tom Brady Family 2016 New England Patriots Super Bowl Rings! Balance of $4,000 remaining." |
| THREE | October 7, 2017 | S.W. wired defendant SPINA $2,500 with the description "2nd Payment on our agreed upon $6,500 DEPOSIT of our October 5, 2017 CONTRACT for three 3 Tom Brady Family 2016 New England Patriots Super Bowl Rings! Balance of $1,500 remaining." |
| FOUR | October 9, 2017 | S.W. wired defendant SPINA $1,500 with the description "3rd Payment on our agreed upon $6,500 DEPOSIT on our October 5, 2017 CONTRACT for 3-Tom Brady Family 2016 New England Patriots Super Bowl Rings! Balance of deposit is paid in-full." |

COUNT FIVE

[18 U.S.C. § 1028A(a)(1)]

On or about October 4, 2017, in Orange County, California, within the Central District of California, and elsewhere, defendant SCOTT V. SPINA, JR., knowingly used, without lawful authority, a means of identification that defendant SPINA knew belonged to another person, namely, the name "T.J.," during and in relation to the offense of Mail Fraud, a felony violation of Title 18, United States Code, Section 1341, as charged in Count One of this Information.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Five of this Information.

2.   The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TRACY L. WILKISON
United States Attorney


SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MARK A. WILLIAMS
Assistant United States Attorney
Chief, Environmental and Community
Safety Crimes Section

ERIK M. SILBER
Assistant United States Attorney
Environmental and Community Safety
Crimes Section