

## THOMAS AMBROSIO

### ATTORNEY AT LAW

Member of NJ & NY Bars

August 15, 2022

Honorable David O. Carter
United States District Judge
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street,
Santa Ana, CA, 92701-4516

Re:    USA vs Scott Spina, Jr.
       8:21-CR-00227-DOC

<u>Sentencing Memorandum</u>

*Mr. Spina might be the best worker I ever supervised in prison or in my multiple managerial roles before my employment with the Federal Bureau of Prisons…He has been a model inmate and has been involved in all programs during his incarceration…I am certain that he has served justice for the crimes he has committed and should be given the opportunity to immediately re-enter society.*

Letter from W. Rasinger, FCI Schuykill, July 31, 2020

*Inmate Scott Spina…has performed exceptional work and maintained a professional attitude. He has been a model inmate and has been involved in all programs during his incarceration…He recognizes the mistakes he has made and I can see that he will dedicate his life to atoning for them, and to redeeming himself…Mr. Spina, the model inmate will become, Mr. Spina the model citizen.*

Letter from L Yohe, FCI Schuykill, July 29, 2020

Scott Spina was 20 years old on July 30, 2018 when he was sentenced to 35 months in federal prison for committing wire fraud in the District of New Jersey. The quotes above are from letters written in support of Mr. Spina's motion for early release under the Cares Act.[1] He is now about to be sentenced on a five count Information for committing mail fraud, wire fraud and identity theft in the Central District of California. The conduct for which he is about to be sentenced occurred *prior* to his arrest for mail fraud in New Jersey. When he negotiated his plea agreement in the District of New Jersey he and his lawyer were unaware that he had potential unresolved federal charges in California. If he had known about the California charges when he negotiated his plea offer in the District of New Jersey then he would have tried to resolve his District of New Jersey case and this Central District of California case with a global plea offer.

Mr. Spina was released from prison to a halfway house on November 3, 2020 and began supervised release on March 26, 2021. Mr. Spina has been a model of rehabilitation both when serving his prison sentence and during his time on supervised release.  He committed no new crimes since his initial appearance on April 10, 2018 in the District in New Jersey. He has done everything that was asked of him by his U.S. Probation Officer while on supervised release and by his U.S. Pretrial Services officer. With the help of supportive parents and his fiancée, he has been a model of rehabilitation and he was on track to have his criminal wrong doing be a distant memory. He works for his fiancée as the manager of her Eyelash salon business in New Jersey. Despite the fact that he now faces, at minimum, a 24-month federal prison sentence he has not been deterred. On May 12, 2022 he proposed to his girlfriend. She will be waiting for him to return from prison so that they can start a family and finally put his criminal past behind him, this time for good.

Since he was arrested for federal charges in New Jersey in 2018 Mr. Spina has been focused on changing his behavior so that he avoids making the same mistakes that he made as an 18- and 19-year-old misguided youngster. There can be no doubt that the goals of sentencing have been met in connection with his 35-month sentence imposed in the District of New Jersey. During that sentence he was able to permanently changed his life for the better. The chances of him being a recidivist are slim to none.

The Court is required to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing which are: to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public and provide the defendant with needed educational or vocational training, medical care or other correctional treatment.

---

[1] Mr. Spina ultimately opted not to make a motion for early release and he completed his originally imposed sentence.

Despite the fact that Mr. Spina paid a substantial debt to society by serving a sentence in which the goals of sentencing were achieved, the Court must now send him back to prison, not because he was a recidivist and committed a crime subsequent to his release from prison, but for a crime that was committed prior to his arrest in the District of New Jersey but not prosecuted until after his release from his 35-month sentence. The sentence that is about to be imposed upon him will therefore be almost entirely punitive.

Mr. Spina respectfully submits that a sentence of 24 months and 1 day is more than sufficient to achieve the goals of sentencing for his current charges.

<u>Sports Memorabilia</u>

Sports memorabilia is big business and big money in the United States. Items associated with famous sports personalities routinely sell at auction for six and seven figures. This case is an example of how the rich and famous in the country are treated differently than the average person. If this case did not have a connection to Tom Brady, the former quarterback for the New England Patriots, it is almost certain there would not have been an investigation by law enforcement.

In 2017 Mr. Spina was 19 years old. At the age of 15 he started buying and selling sneakers and sports memorabilia. His fledgling business led to him making contacts with high school and college athletes, some of whom went into professional leagues. One of his contacts was T.J., referred to as Victim-1 in this case. T.J. was a member of the New England Patriots, the 2017 Super Bowl champions. As a member of the Super Bowl champion team T.J. received a Super Bowl ring. Later that year, no longer a professional football player and in need of money, T.J. contacted Mr. Spina to ask him if he was interested in purchasing T.J.'s Super Bowl Ring and his college football rings.

They eventually reached a verbal agreement for the sale of the rings to Mr. Spina. Within a day, Mr. Spina flew with his girlfriend from New Jersey to Georgia to complete the purchase of the rings. T.J., Spina and Spina's girlfriend met at a gas station/convenience store at approximately 11:00 p.m. In exchange for T.J.'s Super Bowl ring and college ring Spina gave T.J. $20,000 in cash and a $12,000 personal check. The check ultimately bounced.

The Super Bowl ring came in a commemorative box issued by the ring's manufacturer, Jostens Jewelers. In the box was a username and password issued by Jostens to T.J. that gave T.J. access to purchase up to three "family" Super Bowl rings. The "family" rings were identical to the Super Bowl rings given to the players on the Super Bowl champion team, with the exception of being 10% smaller.

When Mr. Spina realized that T.J. had given him a username and password to purchase three "family" rings is when Mr. Spina's knowledge of sports memorabilia got him into trouble. Mr. Spina correctly assumed that a family Super Bowl ring with the same "Brady" inscribed on it

could be sold to sports memorabilia collectors for more money than a family ring inscribed with T.J.'s name.

Mr. Spina, in possession of the username and password that entitled T.J. to purchase three family Super Bowl rings, contacted Jostens, represented himself to be T.J., and ultimately purchased three family Super Bowl rings which he arranged to have inscribed with the name "Brady" on the side of each ring. The purchase price of the three rings was $33,000. Mr. Spina paid for the rings with his own money and they were shipped to him at the address he provided to Jostens.

Within hours after he received the rings Mr. Spina found a buyer willing to purchase the three of them for $81,500, S.W., referred to in the information as Victim-2. Mr. Spina falsely represented to S.W. that Tom Brady had ordered the family Super Bowl rings as gifts to be given to his nephews, inducing S.W. to provide Mr. Spina with a $6,500 deposit.

S.W. ultimately backed out of the deal to purchase the family Super Bowl rings after he suspected that Tom Brady had not authorized their production and had no connection to the rings.

Only a few days later, Mr. Spina sold the three family Super Bowl rings for $100,000 to Golden Auctions., a sports memorabilia dealer based in New Jersey. Golden Auctions put one of the three rings up for sale on his online auction site, representing that Tom Brady authorized its production. Golden Auctions also appeared on national television and made the same representation.

Within a day or so of Golden Auctions putting the ring up for auction representatives of Brady contacted Golden Auctions. and advised them that the auctioned ring had no connection to Brady and that Golden Auction. should cease and desist any communications linking Brady to the ring.  Golden Auctions contract with Mr. Spina allowed him to cancel the deal if the three rings were not in fact authorized by Tom Brady, however, Golden Auctions did not opt to cancel its contract with Mr. Spina.

Prior to Golden Auction's online auction of the family Super Bowl ring advertised as "authorized by Tom Brady" it came to an agreement with Brady's legal representatives that allowed to ring to be auctioned, provided it expressly disclaim that the ring had no connection to not was it authorized by Tom Brady.

In accordance with that agreement the ring description was modified as requested by Brady and the ring sold at auction for $344,000.[2] Golden Auctions retained possession of the two remaining family Super Bowl Rings it purchased from Mr. Spina.

---

[2] Attached is a copy of the letter from the Auctioneer's legal counsel acknowledging the online disclaimer regarding the ring.

Objections to the Presentence Report

Victim-1, T.J.

The PSR indicated that victim T.J, suffered an actual loss of $63,000 when he sold his Super Bowl Ring to Mr. Spina and did not receive any payment in exchange, as was agreed to by T.J. and Mr. Spina. (PSR ¶ 65) Mr. Spina objects to this loss amount. He submits that the actual loss amount to T.J. should be $0.

First, Mr. Spina and T.J agreed to a price of $32,000 for the rings, not $63,000. Second, before T.J. gave Mr. Spina possession of T.J.'s Super Bowl and college rings Mr. Spina claims that he gave T.J. $20,000 in cash and a personal check for $12,000. There is no evidence to dispute that assertion. (T.J. never responded to U.S. Probation's request for a victim impact statement.) It is not believable that T.J. would have handed over his Super Bowl Ring and his college rings to Mr. Spina without first being paid a significant amount of the agreed upon purchase price. Therefore, at a minimum the loss amount to T.J. must be reduced to $12,000, the amount of Mr. Spina's person check that eventually bounced.

Mr. Spina admitted to the Government that when he gave T.J. his $12,000 personal check for partial payment of the rings, the checking account did not have enough money to cover the check. Mr. Spina, at the time was only 19 years old. He was unsophisticated and uneducated about how to properly conduct a business. He further advised the Government that he was going to put money in the account to cover the checks later in the week. T.J. never contacted Mr. Spina in order to recoup the $12,000 that T.J. was out when the check bounced.

Based upon the transaction that took place between T.J. and Mr. Spina, it is respectfully submitted that the Court should determine the actual loss amount to T.J. to be $0.

Victim-2, S.W.

Victim-2, S.W. suffered no actual loss from Mr. Spina's conduct. (PSR ¶ 66) That is because S.W. cancelled the contract to purchase the three family Super Bowl Rings and Mr. Spina returned S.W.'s $6,500 deposit. U.S. Probation, however, attributes an intended loss to S.W. of $81,500 – the price S.W. agreed to pay Mr. Spina for the rings. (PSR ¶ ¶66 and 80). Spina objects to that intended loss amount.

In order for the intended loss amount to S.W. to be $81,500 the three family Super Bowl Rings that Mr. Spina intended to sell to S.W. would have had to have been worth $0. The rings S.W. had contracted to purchase from Mr. Spina didn't come from the bottom of a Cracker Jack box, rather they were pieces of fine jewelry that Mr. Spina purchased from Jostens, the authorized jeweler for the N.F.L. They were made from precious metals and gems. Spina paid Jostens $31,757.86 to have them made.

Based upon the cost of the rings and their inherent value, *at a bare minimum*, the intended loss to S.W. should be reduced to $49,742.14 (81,500 minus $31,757.86) The Court, however, should not stop here, in determining the intended loss to S.W. The three family rings came with a letter of appraisal from its maker that assesses its jewelry value at $29,700. Therefore, the total appraised value of the three family Super Bowl Rings that Mr. Spina contracted to sell to S.W. was $89,100. The intended loss to S.W. should be $0.

Spina explained to the Government that the reason he had the name "Brady" inscribed on the family Super Bowl Rings be purchased by using T.J.'s identity is that he believed the name "Brady" would make the rings more valuable to sports memorabilia collectors. His belief turned out to be correct, evidenced by the fact that just one of the three rings which Spina ultimately sold to G.G. was sold at auction by G.G. for $344,927.[3]

Based upon how T.J.'s Super Bowl Ring and the three family Super Bowl Rings were acquired and sold by Mr. Spina, the Court is asked to conclude that both the actual and the intended loss to Victim-1, T.J. and Victim-2, S.W. is $0. If the Court were to agree that the actual and intended loss amount for both victims is $0 the correct Guideline calculation would be as follows"

| | |
|---|---|
| Base offense Level | 7 |
| Loss Amount Adjustment | 0 |
| Adjusted Offense Level | 7 |
| Acceptance of Responsibility | -2 |
| Total Offense Level | 5 |

Mr. Spina's criminal history makes him a Criminal History Category IV and the resulting sentencing range is 4 to 10 months.

Mr. Spina's conviction for Aggravated Identity Theft requires the Court to impose a sentence of 24 months, consecutive to the sentence imposed on Counts 1-4.

<u>PSR Paragraph 94</u>

Paragraph 94 of the PSR references a June 30, 2017 arrest of Mr. Spina. He received 0 criminal history points for that incident.

The PSR incorrectly states "Ultimately Spina, who was represented by counsel, pled guilty to disorderly conduct and the simple assault charge was dismissed at sentencing by a motion of the prosecution." Mr. Spina did not plead guilty to any criminal offense as evidenced by the

---

[3] See attached news articles concerning the sale of the family Super Bowl Ring.

attached certified copy of the Wayne Municipal Court disposition which shows that the charge related to the June 30, 2017 incident was dismissed and that Mr. Spina ultimately pled guilty to Wayne Municipal Ordinance 121-2, Unnecessary Noise.

Mr. Spina respectfully requests that the PSR be modified to reflect that Passaic County criminal complaint W-2017-000745-1614 was dismissed and amended to a non-criminal ordinance. The requested PSR modification is extremely important to Mr. Spina because inclusion of the incorrect disposition, *i.e.*, his having a criminal conviction for disorderly conduct, will very likely require him to serve his sentence in a medium security prison versus a low security camp.

<u>Letters</u>

Included with this sentencing submission are three letters. The first letter is from the Newark, New Jersey YMCA thanking Mr. Spina for his donation in the YMCA's 2020 holiday toy drive. His support and donation is even more commendable when one considers that he was in a halfway when he made his donation to the YMCA toy drive.

The second letter is from Mr. Spina's mother. She provides Your Honor with a very factual and unemotional description of Mr. Spina's 35-month prior federal prison sentence. She describes the impact of his sentence upon her family and Mr. Spina. She made no excuses for his *past* criminal conduct, however, she details her son's unwavering efforts to rehabilitate himself and atone for his misguided criminal conduct. She corroborates the sentiments contained in quotations that start out this memorandum when she writes,

> *As Scott has demonstrated in his rehabilitation while previously incarcerated, he has done just that. He had a stellar record while incarcerated and obeyed all the laws of the facility. I ask your Honor to still give him that chance as a young man who has served hard years. He was the youngest of them all.*

The final letter is from Mr. Spina. A major theme of this sentencing submission can be summed up by the following statement,

> *I was incarcerated for a period of 30 months in 2018 for actions that I have committed. My life has since changed drastically. I am no longer that young, reckless, and selfish person. Incarceration has changed my life regarding my perspective in valuing the smallest things in this world, and understanding how every action has a consequence. I cannot do anything pertaining to my past conduct. I can only improve my conduct now and in the future. The past is not a reflection of the man that I am today.*

<u>Conclusion</u>

Based upon the forgoing the Court is respectfully requested to sentence Scott Spina to 1 day in prison on Counts 1-4 and to 24 months on Count 5 consecutive to the sentence on Counts 1-4.

Respectfully yours,

*/s/Thomas Ambrosio*
Thomas Ambrosio

cc:     Scott Spina (via email)